### 5460.   FALK *v.* LAGRANGE CIGAR COMPANY *et al.*

A contract stipulating that one of the parties thereto shall receive as compensation for certain services a half of the profits of the business to be conducted, and shall not provide any of the assets nor be bound for any of the losses, is not a contract of partnership; and the party thus receiving a portion of the profits for his services is not bound for debts of the business.

DECIDED JANUARY 20, 1915.

Complaint; from city court of LaGrange—Judge Harwell. December 12, 1913.

*E. R. Bradfield, M. U. Mooty,* for plaintiff.

*Hatton Lovejoy,* for defendant.

RUSSELL, C. J.   M. Falk brought suit upon an open account against the LaGrange Cigar Company, alleging it to be a partnership composed of F. R. Knight and LaGrange Grocery Company. There was no denial of the account by Knight, but the LaGrange Grocery Company filed a plea in abatement, denying any partnership with Knight in the business of LaGrange Cigar Company or otherwise, and denying any indebtedness whatever to the plaintiff. On the trial there was oral testimony for the plaintiff to the effect that Knight had admitted the correctness and justness of the account sued on, as against the LaGrange Cigar Company and himself, but stated that the LaGrange Grocery Company, though it got a part of the profits of the LaGrange Cigar Company, was not a partner in the business of the cigar company. The plaintiff introduced also certain paid checks of the grocery company, identified as having been in payment of indebtedness contracted by the cigar

company, the ledger account of the grocery company against the cigar company, showing credit charges for cigars furnished and debit charges for amounts paid out, and the order book, showing orders for cigars, addressed to the cigar company by the grocery company. There was also introduced in behalf of the plaintiff a written contract entered into between the grocery company and Knight, as follows: "Georgia, Troup County: This contract entered into this 23rd day of April, 1909, between the LaGrange Grocery Company and F. R. Knight, witnesseth: that whereas the said F. R. Knight is preparing to equip and operate a plant for the manufacture of cigars, and is desirous of securing the services of said LaGrange Grocery Company as selling agents and to act within the limits of this agreement as financial agent of the said F. R. Knight; now, therefore, it is mutually agreed between the said F. R. Knight and the said LaGrange Grocery Company as follows: The said F. R. Knight shall equip and put into operation a plant for the manufacture of cigars in the city of LaGrange, Georgia, the same to be placed in the building belonging to George E. Dallis, on Ridley avenue. The rent for the room or the space occupied by the said tenant, and all other expenses incident to the manufacture of the cigars, are to be paid by the said F. R. Knight and charged into expenses. The said Knight is to put into the said plant about $800 at this time and to allow the increase from said earnings to remain in said plant. Said Knight is to operate the said plant and to deliver to said LaGrange Grocery Company so many of the cigars made in said plant as said grocery company does sell or take the entire output said Knight can then sell the remainder to his own best advantage. Said grocery company agrees to place said cigars upon the market through their salesman, and to endeavor to sell the entire output of said factory, if possible. Said grocery company further agrees to handle the receipts and disbursements from said sales and it is agreed that this shall be done for the purpose of determining the profits as hereafter explained. Said grocery company further agrees to assist wherever possible in the purchase of supplies and in other ways in making successful the business of said plant. Said Knight is to manage the factory and have charge of the manufacture and production of cigars. A record shall be kept of all expenses, and the said F. R. Knight shall receive the usual amount as a workman for the making of cigars, but shall

draw out no other amount, the aforesaid amount to be received by said Knight to be charged as a part of the expenses. The expenses incurred by said Knight in making sales himself shall not be charged as expenses. For their services in placing the output of said factory upon the market through their salesmen, the said grocery company shall receive as compensation one half of the profits from the entire output of said factory, including such cigars as may be sold by Knight himself, as well as those also sold by said grocery company. Said profits are to be determined by taking an inventory of the property on hand and making a statement of the assets and liabilities of the business, together with the receipts and disbursements. Should said business prove successful, and should it be determined to incorporate the same at any time in the future, the said grocery company is to have the right to take all the stock in said corporation, except as is taken by the said Knight individually to cover any property and money put in said corporation by him, and in any event said grocery company is to have the right to take fifty-one per cent. of the said stock of said corporation. Nothing herein contained shall be construed as making the parties hereto copartners, or either of said parties in any way responsible for the liabilities of the other; the only object of this agreement being to secure the services of said grocery company in the placing of the product of said factory upon the market. This contract shall remain in force, except as to a possible change in location, for a period of two years, unless mutually agreed to by both parties." Then follows the prices of cigars, terms, etc. The contract is signed by both parties, and an endorsement appears thereon, as follows: "By mutual agreement this contract is to remain in force until January 1st, 1914."

J. D. Faver, sworn in behalf of the LaGrange Grocery Company, testified: I am general manager of the grocery company, and was connected with it at the time this contract was made. Knight furnished all money and property for the cigar company. The grocery company did not furnish anything, but were only selling agents, purchasing cigars from him. When we ordered cigars we paid for them according to contract. This gave Knight a profit of 10 per cent., as he estimated. We credited them for him as cash. We gave him orders, the amount was credited at the end of each month as if cash, and he drew against it. We disbursed money for him

by paying his approved bills, and no other way. Mr. Knight bought tobacco supplies and everything, and paid all expenses. He got the money from us, but we knew nothing about what he did with it. At his request we would give him a check every Saturday for the pay-roll. Nothing was ever paid out of the money belonging to the grocery company, but everything was paid and charged to the cigar company. We had no authority to pay out money in any other manner. We took a mortgage for money due us by Knight, and never put any money in the business except as a loan to Knight. We charged him up with this money and he was to pay it back, regardless of whether there were any profits or not, and we had no interest whatever in the business. We advanced him money along with the cigars, and let him draw against it. When he quit business he owed us about $3,000, which we had loaned him and which was secured by a mortgage. We sold the cigars bought of Knight on our own account. We paid him about what other factories sold them for. The only business in which the grocery company was to profit was the difference in the cost of manufacturing and the price we paid him for cigars, as stipulated in the contract. Mr. Knight was to keep an account of the total cost of the manufacture of the cigars, and the difference between that and what we paid him would represent the profits. We took practically the entire output of the factory and kept an account of the money disbursed for Knight, and the balance left, debit or credit, belonged to the cigar company, except as we might have had a profit in it had there been one as called for in the contract. We did not keep the books of the cigar company. I do not know how much he owed. The cigar company is not in business now. Their assets were sold under a mortgage and bought in by the grocery company. Mr. Knight could have sold the plant any time he wanted to. The grocery company could never have sold it. We had no authority to pay out money except by Knight's direction, and never did. He was always in debt to us after the first two or three months. W. G. Cleaveland testified, in behalf of the grocery company, that he was the manager of the grocery company at the time the contract was made, and that when he was connected with the grocery company, the business between it and the cigar company was conducted in about the same manner as related by the witness Faver. His testimony was practically the same as that of Faver. At the conclusion of the testimony the

court directed a verdict against Knight and the LaGrange Cigar Company, but directed that the jury find in favor of the LaGrange Grocery Company on its plea of no partnership.

It is not contended that the LaGrange Grocery Company held itself out to the plaintiff as a partner in the LaGrange Cigar Company, and thus induced him to extend credit to the cigar company, but it is contended that Knight and the LaGrange Grocery Company were in fact partners inter se, and as such they were indebted to him the amount of the account sued on. Partnership is a fact. The oral testimony adduced in this case is of little consequence, as is all the other evidence save the contract, which is set out in full herein. The material question is whether this contract, by its terms, created a legal partnership between the parties thereto and bound them as such for the indebtedness even though it is expressly stipulated therein that they are not so to be bound. When a court is called upon to determine whether a particular contract constitutes a partnership, its controlling purpose is to ascertain the intention of the parties as disclosed by the entire transaction. But the intention which controls in determining the existence or non-existence of a partnership is the intention legally deducible from the terms of the contract and from the acts of the parties, and if they enter into an enterprise and conduct it in such a way that the law constitutes their relation a partnership, they are partners, although they express their intention not to be. Even an express statement in a contract that the agreement does not constitute a partnership is not conclusive. 30 Cyc. 361. After a careful study of the contract between the parties in the instant case, and of the law governing partnerships and their creation, we have come to the conclusion that the parties are not partners and are not bound as such.

The mode of determining what constitutes a partnership has undergone many changes. Under the very early English rule, mere participation in profits made one a partner. This rule was later abandoned in England; and the provisions of our code as well as the decisions of the Supreme Court make it clear that this rule does not apply in Georgia. Applying the tests there laid down, it is clear that no partnership liability was imposed upon the defendant in this case by the terms of the contract under consideration. Sections 3155 and 3158 of the Civil Code declare how a partnership

may be created. "A joint interest in the partnership property, or a joint interest in the profits and losses of the business, constitutes a partnership as to third persons. A common interest in profits alone does not." Civil Code, § 3158. With this quotation from the code we might conclude; for to our mind this is sufficient to show that the contract in the present case does not constitute a partnership. There is neither a joint interest in the partnership property nor a joint interest in the profits and losses of the business. Let us go further, however, and see what construction our courts have put on this section, and how they have construed all the law relative to partnerships as laid down in the code. In *Dawson National Bank* v. *Ward & Gurr*, 120 *Ga.* 861 (48 S. E. 313), our Supreme Court said: "If the party's interest is that of owner; if he has a right to dispose of and control the profits of the enterprise as profits, then there is a partnership. Where, however, a party makes no contribution to the capital stock of the concern, nor has any right to control the profits, but only is to receive a certain proportion of the net profits in compensation for his labor, the partnership relation does not exist." In the case at bar the grocery company made no contribution to the capital stock of the cigar company, and had no control of the profits as such. It was to receive a certain proportion of the profits for its services as sales agent and as financial agent. The mere fact that the grocery company was in charge of the funds would make no material difference. It was a part of its duties, under the contract, to keep and disburse money for Knight. It had no right to control any of the proceeds of the factory operated by Knight, nor any right to pay out any funds except on the order of Knight. In the case of *Dawson National Bank* v. *Ward & Gurr*, supra, it was probably Gurr's duty not only to receive, but to disburse moneys coming into his hands in the operation of the warehouse; but this did not itself constitute a partnership. See also, in this connection, *Thornton* v. *McDonald*, 108 *Ga.* 3 (33 S. E. 680). It has been uniformly held that where parties have only a "common interest" in the profits, and the position of one is that merely of an employee, with no right of control over the profits, but with only a common interest in them, that is, interested in common with the other in their increase or decrease, because they measure the amount of his wages, then he is not a partner. See *Sankey* v. *Columbus Iron Works*, 44 *Ga.* 235, and

*Thornton* v. *McDonald,* supra. "If one only receives part of the profits as a salary or compensation for services, he is not a partner." *Huggins* v. *Huggins,* 117 *Ga.* 156 (43 S. E. 759). It is contended by the plaintiff in error that the instant case comes within the ruling in the *Huggins* case, supra, as stated in the third headnote: "If one who originally contributed no capital, but was to receive a part of the profits as compensation for his services, permits a portion of such profits to remain in the business as firm assets, he thereby acquires a joint ownership in the undivided property, and becomes a partner," etc. In the present case this can not be true, however, for, as was shown by the evidence, there were no profits at the time the contract originally expired, nor at any other time thereafter. The grocery company, then, never at any time had any interest of any kind in the profits. No inventory was ever taken to ascertain what were the profits. No one ever received any profits out of the business, and therefore the defendant could not have left any profits in the business to become a part of the firm assets.

It is true, as contended by the plaintiff in error, that the contract was a favorable one to the grocery company. That company, however, perhaps was entitled to demand an advantageous contract. It was undertaking to perform for Knight a great service, and the mere fact that it sought to protect itself by reserving a right to purchase a controlling interest in the business in the future should the business prove successful would not constitute a present partnership. This was merely good business judgment. If the business had succeeded, through the efforts of the grocery company in placing its goods upon the market, it would have had the right, as a part of its compensation under the contract, to acquire an actual interest in the assets of a corporation to be formed. During the pendency of the original contract, however, its compensation was measured by a half interest in the net profits. It was to its interest to make the cigar company a successful enterprise. It evidently endeavored to make the cigar company succeed. It loaned money to the cigar company from time to time, and took a mortgage as security; and while this does not enter into the case except collaterally, the contention of the grocery company that it was not a partner is supported by the fact that the grocery company took such a mortgage from Knight, "doing business as the LaGrange

Cigar Company," and had the mortgage placed on record some time prior to the date of the sale of the goods, for the purchase-price of which the present suit was brought.

While there are numerous conflicting decisions on the question as to what is necessary to show the creation of a partnership, it is clear to us that the parties to the contract in the present case intended merely to divide the net profits, and that the portion thereof which was to go to the grocery company was for its services as selling agent and as financial agent, and that it was not the intention of the parties, nor the legal import of the contract, to create a partnership between them. The judgment of the court was correct.

*Judgment affirmed. Broyles, J., not presiding.*